Peckham v. Keenan.

No. 26,825.

C. W. Peckham, *Appellant,* v. H. H. Keenan and T. M. Thomas, doing business as the Thomas Investment Company, et al., *Appellees.*

SYLLABUS BY THE COURT.

1. Exchange of Property—*Rescission of Contract—Sufficiency of Evidence.* In an action to rescind a contract for the exchange of corporate stock, the record is examined and it is held that the findings of fact made by the trial court are supported by competent, substantial evidence.

2. Trial—*Trial by Court—Special Interrogatories.* The trial court, in cases tried to the court, is not required to answer special questions.

Appeal from Sedgwick district court, division No. 1; Thomas E. Elcock, judge. Opinion filed February 12, 1927. Affirmed.

*Carr W. Taylor,* of Hutchinson, and *William Keith,* of Wichita, for the appellant.

*Robert C. Foulston, W. E. Holmes, D. W. Eaton, George Siefkin, Sidney L. Foulston* and *John W. Wood,* all of Wichita, for the appellees.

The opinion of the court was delivered by

Harvey, J.: This is an action to rescind, because of the alleged fraud of defendants, a contract by which plaintiff traded 200 shares of the capital stock of the Monarch Cement Company, and for the recovery of the stock, or its value. The defendants named were H. A. Hewitt, A. F. Carson, Walter Krouse, H. H. Keenan, T. M. Thomas, doing business as the Thomas Investment Company, Carl L. Lamb and Paul Brown. Defendants Carson and Lamb were never served with summons; defendants Hewitt and Krouse defaulted; plaintiff settled his controversy with Brown, as to 100 shares of the stock, without prejudice to his action against other defendants as to the remaining 100 shares of stock. Defendants Keenan and Thomas answered and defended. The court found for defendants. Plaintiff has appealed. The court made the following findings of fact and conclusions of law:

FINDINGS OF FACT.

"1. On and prior to the 13th day of May, 1922, plaintiff C. W. Peckham, a man of about seventy-five years of age and residing in the city of Haven, Reno county, Kansas, was the owner of 236 shares of the capital stock of the Monarch Cement Company, of Humboldt, Kan. The stock was a reissue

Exchange of Property, 28 C. J. p. 232 n. 8. Trial, 38 Cyc. p. 1957 n. 33.

Peckham v. Keenan.   .

upon reorganization of the company which had previously been in financial difficulties and was dormant and inactive, having not paid dividends for some time and of a market value of $26 per share. A dividend had been declared on said stock but had not been paid for the reason that the company had no funds to pay it. Peckham was familiar with this fact. He was and is a man of considerable intelligence and had had considerable business experience.

"2. On the 13th day of May, 1922, defendants Hewitt, Carson, and Krouse came to plaintiff's home in Haven, Kan. They were acting jointly. They represented to plaintiff that a pool was being formed to get control of the Mon-. arch Cement Company; that this was nearly completed; that a friend of plaintiff's named Gus Roll had sold his stock; that this was the last day in which plaintiff could get in on the pool and if he did not get in on this day his stock would be of little value; that with plaintiff's stock those forming the pool would have about 51 per cent of the stock and would have control; that if plaintiff did not sell his stock it would be of little or no value. They proposed to trade plaintiff 1,400 shares of Elmhurst Investment Company stock for his cement stock, and represented to plaintiff that the Elmhurst Investment Company stock was selling at par or $10 a share, and that there was a ready market for it and that it had paid substantial dividends every year. These representations regarding the formation of the pool and the value of the Elmhurst stock were false and known to be false by defendants Hewitt and Carson, who made them, and were made for the purpose of defrauding the plaintiff out of his stock. Defendants Hewitt and Carson further agreed with plaintiff that they would sell his Elmhurst stock within six months at par and put up fifty dollars as forfeit money on this latter agreement. The writings in connection with this trade were introduced in evidence and are exhibits 'A' and 'B.'

"3. Becoming uneasy about the deal, on May 14, 1922, plaintiff wrote a letter to H. F. G. Wulf, of the Monarch Cement Company, stating what his deal was and instructing Mr. Wulf not to transfer the stock. This letter was introduced in evidence and is marked Defendant's Exhibit 2. Plaintiff also at or about said time came to Wichita and interviewed defendant Paul Brown, a reputable attorney of Wichita, Kan., seeking advice as to his rights in the premises. Brown undertook to and did advise Peckham as to his rights and the remedies for their redress. Peckham did not employ Brown to institute a suit at this time or instruct him to do so, stating to Brown that he wished first to consult some attorneys of his own at Hutchinson, Kan. On this visit Brown prepared a demand on Hewitt and Carson for the return of the stock, a copy of which was introduced in evidence and is marked Exhibit 'H.' On this visit also Brown, at Peckham's request, called up T. M. Thomas, who was engaged in the business of selling stocks and bonds in the city, inquiring of him as to the market value of Elmhurst Investment stock. He was advised by Thomas that it was worth about $1.30 per share. Peckham then took this demand and started out to find Hewitt and Carson. He found them on the streets of the city and followed them until he was near Thomas's office, asking them to step into Thomas's office. Carson went into the office but Hewitt stayed outside. Defendant Keenan happened to be present in Thomas's office on this occasion.

35—122 Kan.

The demand was read by Peckham to Carson and Peckham attempted to deliver a copy of same to Carson. Carson refused to take it and Peckham left it on Thomas' desk. All these events transpired on May 15, 1922. Peckham returned to Brown's office, informing him of the circumstances surrounding the making of the demand and then left Wichita.

"4. On May 25, 1922, Krouse went to Haven and interviewed Peckham regarding the trade. He then stated to Peckham that he was the principal in the transaction and urged Peckham to release the stock, and threatened him with suit if he would not do so. Peckham communicated the fact of this visit to Brown. Krouse also called on Peckham on May 31, 1922, making like demands. On June 1st, Krouse's visit to Peckham was reported by Peckham to Brown in a letter of that date. At or about this time Krouse also called at Brown's office and attempted to persuade Brown to release the stock to him. Brown refused. Prior to this time Brown had interviewed Mr. Wulf of the Monarch Cement Company and had secured Wulf's promise not to transfer the stock. Likewise, Wulf had promised Peckham not to transfer the stock.

"5. On September 5, 1922, Hewitt and Carson called on Peckham and tried to persuade Peckham to release the stock. Peckham refused and reported this visit to Brown.

"6. Shortly after securing the Peckham stock, Krouse hypothecated it at the American State Bank of Wichita, Kan., to secure a loan to him of some $1,700. During the time of these various negotiations the stock had been presented to the company and transfer had been refused. Peckham knew this.

"7. Some time during August, 1922, Peckham went to Brown and instructed Brown to prepare an action to recover his stock. He did not, however, give Brown instructions to file such action but told him not to file it, believing that he might be able to make some sort of a settlement or adjustment with Hewitt, Carson and Krouse.

"8. On September 14, 1922, defendants Keenan and Lamb visited Mr. Peckham at his home in Haven, seeking to interest him in trading his Monarch cement stock for stock in the Cream-O-Milk Company. Lamb was an officer in that company, which was named the Cream-O-Milk Company, a corporation, incorporated under the laws of the state of Colorado, and had a capital stock of 50,000 shares of no par value. Lamb stated to Peckham that the company was being at that time organized in the city of Wichita and that a number of prominent men were interesting themselves in the company and had purchased stock in the same, giving the names of A. A. Hyde, W. C. Coleman and others. They further stated that the stock had not yet been generally placed on the market but that it was proposed to put it upon the market at $50 a share. They represented that Mr. Hunter had purchased $21,000 worth of the stock and paid cash therefor, and that the other stockholders had paid cash for their stock; that the product to be manufactured had already been placed on sale in Wichita; that the same was highly recommended; that the product had great advantages due to the fact that it preserved the whole milk and could be easily transported; that a plant was then being constructed by the company for the manufacture of the product at Larned, Kan.; that

the company was considering the establishment of other plants elsewhere in the state of Kansas, among other places mentioned being Halstead, Kan. All of the persons mentioned as being connected with the company were in fact so connected and all had paid something for their stock, although Coleman had not paid $50 a share and R. B. Campbell probably had not received and paid for his stock but had subscribed for same. The stock had not yet been generally placed on the market. The product was on sale in Wichita. Hunter had not paid cash for $21,000 worth of the stock but had purchased that amount, giving other stock in exchange therefor. The plant was being constructed at Larned, Kan., and was visited by plaintiff. The location of other plants was being considered by the company, among them being a plant at Halstead.

"9. At times other than September 14, the exact dates of which the court is unable to fix, but subsequent to September 14, 1922, Lamb and Keenan called upon Peckham in regard to trading the stock. On each of these visits Keenan and Lamb stated to Peckham that they were in a position to secure the release of his Monarch stock. They represented to Peckham that his stock was paying no dividends and it was uncertain when a dividend would be paid. This was true. They stated to Peckham that the English and Canadian rights to manufacture the product had been sold for considerable sums. No proof has been offered that this was untrue. They further stated to Peckham that the company had brilliant prospects and was sure to be a big success, and some other statements of a similar nature. These statements, whether true or not, were, in the court's judgment, mere puffing. The product itself was an excellent product and was on sale in Wichita. They stated to Peckham that same had been highly recommended by prominent physicians in Wichita and this was true.

"10. Keenan and Lamb invited Peckham to come to Wichita and inspect the proposition for himself and on the 20th day of September, 1922, he did so. In company with Keenan he went to Paul Brown's office and asked Paul Brown his opinion of the proposition. Brown stated to him that he could give him no advice as to the merit of the proposition as an investment, but would advise him as to the legality of any feature concerning which he wished advice. Brown stated, however, that he would go with Peckham and introduce him to some of the men who had been mentioned by Lamb and Keenan to Peckham. Brown, Keenan and Peckham then called on R. B. Campbell and discussed the proposition with him at considerable length. Campbell recommended it, saying that he had subscribed for stock and believed the company had good prospects of becoming a success. Peckham, Brown and Keenan then called on W. C. Coleman, a prominent business man of the city of Wichita and president of the Coleman Lamp Company, who was at that time an officer and stockholder in the Cream-O-Milk Company. Coleman went into the affairs of the company thoroughly, explaining the proposition and plan in all its details, saying that he believed it to be a good investment and that it would be a success. He made it clear that the project was purely a speculative one, that it was a venture, but that he believed in the proposition thoroughly, and had purchased stock in it although he had not paid $50

a share for same. After leaving Coleman's office, Peckham, Brown and Keenan went to the office of W. M. G. House, president of the Johnson-Larimer Dry Goods Company, who was also interested in the venture, but did not find Mr. House in. They then went to the office of J. H. Elem, a prominent business man of the city, who was an officer and stockholder in the company, and discussed the affairs of the company thoroughly with him. Later, and on the same day, Peckham returned to Elem's office in company with Mr. Dunsworth, a neighbor of Peckham's, who was an old acquaintance of Elem's, and further discussed the proposition. Mr. Peckham in these various discussions informed himself fully and thoroughly as to the character and nature of the enterprise, its assets and its expectation of success. He understood fully what the proposition was, and after such investigation, in all that he subsequently did, relied wholly upon such investigation and what it had disclosed and acted wholly upon his own judgment in the events that subsequently transpired.

"11. Later and on the same day, Keenan, Brown, Thomas and Lamb met in Thomas' office and the details of the trade that was about to be made were there discussed. Brown took a memorandum and later embodied the trade which the parties then agreed upon in a contract which has been introduced and is marked Exhibit 'L.' Exhibit 'L' was then prepared by Brown. In the meantime Peckham had returned to Haven.

"12. On September 21, 1922, Peckham wrote Brown from Haven that he had decided not to turn but 100 shares on the trade, instead of 200 shares as tentatively agreed upon orally at the conference in Thomas' office.

"13. On September 22 Paul Brown called Peckham over the telephone, informing him that Keenan was there for the contracts and asking Peckham if he should let him have them. In this conversation Peckham informed Brown of his letter of the 21st which had not yet been received by Brown, but told Brown to give the contract to Keenan anyway, and if he desired to change it he would do so when Keenan brought it up for his signature.

"14. On the 22d or 23d of September, 1922, Keenan took the contract and an order on the Monarch Cement Company releasing Peckham's stock, and a certificate for 128 shares of Cream-O-Milk stock and went to Haven. Peckham signed the contract and release and the Cream-O-Milk stock was delivered to him. At the same time and as part of the same transaction, Keenan agreed with Peckham that if Peckham would sign the contract for the exchange of the 200 shares of Monarch stock, he, Keenan, would sell one-half of the Cream-O-Milk stock for him at any time he desired before March 1, 1923. Keenan never reported to Lamb or Thomas that he had made Peckham this promise. Peckham never requested Keenan to carry out this promise.

"15. On or about May 24, 1923, Peckham wrote Lamb regarding the sale of half of the Cream-O-Milk stock. This seems to be the first demand that Peckham ever made that this agreement for the sale of half of his stock be carried out. The letter written by Peckham to Lamb on May 24 was not produced in evidence and the court is unable to state its contents. It seems, however, to have contained a statement that the promise had been made by Keenan alone. Peckham evidently regarded the promise as having been made

on behalf of the Cream-O-Milk Company, as indicated by his letter of May 29 to J. H. Elem, which was introduced in evidence and marked Exhibit 'BB.'

"16. The arrangement entered into between Thomas, Keenan and Lamb was in substance as follows: Lamb was to give the Cream-O-Milk stock to Peckham in exchange for the release of the cement stock, and when so released Thomas was to purchase the cement stock. Keenan was to receive $300 out of the transaction for his part in helping to consummate the deal. The purchase was handled in this way: Thomas issued a check for $1,700 payable to Walter Krouse. This was indorsed by Walter Krouse and delivered to the American State Bank, which thereupon delivered the Monarch stock to Lamb. Lamb then delivered the stock to Thomas and received from Thomas two checks, one for $300 and the other for $4,211.40. Lamb cashed both these checks, turning $300 over to Keenan. Lamb had previously furnished the Cream-O-Milk stock as provided for in the contract between Peckham, Thomas and the Cream-O-Milk Company, by Lamb as vice president.

"17. Shortly thereafter the Cream-O-Milk stock was placed on the market by the company at $50 a share, and was sold at that figure. There were in fact three distinct corporations with similar names: The Cream-O-Milk Company of Kansas, the Cream-O-Milk Company of Colorado, and the Cream-O-Milk Company, organized under the laws of Colorado. It was stock in this last company that was sold to plaintiff. Plaintiff may not have understood that there was a Cream-O-Milk Company of Kansas or a Cream-O-Milk Company of Colorado, but he did understand and was informed what the Cream-O-Milk Company organized under the laws of Colorado was, and all representations made to him regarding the stock were made regarding the stock of the Cream-O-Milk Company organized under the laws of the state of Colorado. He was not misled or confused by reason of the fact of the existence of the three companies. Subsequently and during the fall of 1923 the Cream-O-Milk Company failed and its affairs were placed in the hands of a receiver, and its stock is now of very little, if any, value. Meanwhile, the stock of the Monarch Cement Company had increased considerably in value. At no time prior to the receivership of the Cream-O-Milk Company did plaintiff make any demand upon any of the defendants for the return of his Monarch cement stock, nor did said plaintiff at any time prior to said receivership make to any of the defendants any complaint of the transaction mentioned in and covered by the contract for exchange of the Cream-O-Milk stock for the Monarch Cement stock.

"18. The court finds that there was no connection between the transactions in which Krouse, Hewitt and Carson were interested and the transaction between Thomas, Lamb, Keenan and Peckham in which the Cream-O-Milk stock was traded for the Monarch cement stock. The court finds that there was no conspiracy amongst the defendants Brown, Thomas, Lamb and Keenan, between themselves or with any other person, to defraud plaintiff, but that Hewitt, Carson and Krouse did conspire to defraud plaintiff and did defraud him.

"19. After Thomas acquired the stock he proposed selling 100 shares of it to Brown. Brown called up Peckham and asked him if it would be all right for him, Brown, to buy a part of Peckham's stock and Peckham assured him

that it was all right and gave his consent to the transaction. Peckham at no time understood that Brown was purchasing the stock for him. When the stock was obtained from the bank by Lamb, it was sent to the Cement Company and transfers were made as follows: 100 shares to Brown; 100 shares to Thomas, and 36 shares to Peckham. This 36 shares was delivered to Peckham in the fall of 1922 was sold by him. Brown paid Thomas the full market value for the stock purchased by him, to wit: $27.50 per share. Thomas sold the one hundred shares retained by him, on November 9, 1922, to Strandberg-McGreevy & Company at $29.50 per share.

"The court has received requests for findings from the parties, numbered 1 to 23 by plaintiff Peckham, 1 to 51 by defendant Thomas, and 1 to 9 by defendant Keenan. Plaintiff has likewise propounded 115 special questions. The court understands the law to be that the court is not required to answer special questions. It is believed, however, by the court that the foregoing findings of fact sufficiently cover the facts of this case and are determinative of the litigation.

"Conclusions of Law.

"The court concludes as a matter of law that while plaintiff was defrauded by defendants Hewitt and Krouse, the remedy of rescission is not now open to him.

"The court further concludes as a matter of law that the plaintiff was not defrauded by defendants Brown, Keenan, Thomas or Lamb, and the remedy of rescission is not open to him as regards these defendants.

"The court further concludes as a matter of law that the costs of this action should be taxed to plaintiff."

This case, as between plaintiff and the contesting defendants, turns upon the facts. There is no controversy of consequence over the law pertaining to the case. Broadly speaking, plaintiff's right to rescind depends upon two questions, viz.: (1) Did plaintiff make but one trade of his stock, or did he make two trades? (2) If he did make two trades, was he induced, by fraud of defendants, to make the second trade?

Plaintiff contends that all the transactions, beginning with his dealings with Hewitt, Carson and Krouse, May 13, 1922, until after his final release of the certificates of stock, late in September, 1922, and even the later sales of the stock made by Thomas, are so connected in fact that they should be treated as one transaction, for the purpose of determining plaintiff's right to rescind. The trial court found plaintiff had two transactions—made two trades of his stock; that his first trade, May 13, 1922, was with Hewitt, Carson and Krouse; that the other defendants had nothing to do with this trade; that plaintiff was induced to make this trade by the fraudulent representations of Hewitt, Carson and Krouse; that he and his at-

torney succeeded in preventing a transfer of his certificates of stock on the books of the Monarch Cement Company and held in abeyance for several months either the completion or the rescission of that trade; that in September, 1922, plaintiff made another trade of his stock to Keenan, Lamb and Thomas; that in doing so he in effect got his stock back from Hewitt, Carson and Krouse; that Hewitt, Carson and Krouse had nothing to do with this second trade, except that they waived or released any claim they had upon plaintiff's stock in the Monarch Cement Company upon the payment by Lamb to Krouse of $1,700; that what Lamb paid Krouse, if anything was of little or no concern to plaintiff; that plaintiff did in effect get his stock back from Hewitt, Carson and Krouse and traded it to Keenan, Lamb and Thomas.

Having determined that plaintiff made two trades of his Monarch Cement Company stock, the next question is, Was he induced to make the second trade by the fraudulent representations of Keenan, Thomas, Lamb, and Brown, or of any of them? The court found, (a) that no fraudulent representations were made to him in connection with this trade, and (b) that plaintiff did not rely upon any representations made to him by these defendants, or any of them, but made an investigation of his own, upon which he acted.

The findings of the trial court are sustained by the evidence. In reaching this conclusion we have not relied upon the abstracts, because of a controversy between counsel as to their accuracy, but we sent for the transcript of testimony and have examined it with care.

Appellant complains that the trial court erred in making material findings of fact contrary to the evidence and to the weight of the evidence, and under this heading complains of many specific details of the findings, quotes or refers to the evidence, or some of it, pertaining thereto, and argues either that the specific portions of the findings complained of are against the weight of the evidence, or that they are not supported by any evidence. It is not necessary to analyze these separate complaints in detail, and to do so would unnecessarily lengthen this opinion. Complaints that findings are contrary to the weight of the evidence are not open to review. It is the function of the trial court to weigh the evidence. (*Farney v. Hauser,* 109 Kan. 75, syl. ¶ 7, 198 Pac. 178; *Rezac v. Rezac,* 115 Kan. 482, 223 Pac. 295.) Complaints that findings are not supported by any evidence are open to review. (*Bell v. Skinner,* 119

Kan. 286, 239 Pac. 965; *Bortnick v. Cudahy Packing Co.*, 119 Kan. 864, 241 Pac. 442.)   But an examination of the record in this case discloses that each of the findings of the court, and all· material portions of them, were supported by· competent, substantial evidence.

Appellant complains that the court did not make other and additional findings of fact.   The findings made covered the material facts established by the evidence.   That is as far as the court is required to make findings of fact, and is as far as findings should be made.   (R. S. 60-2921; *Shuler v. Lashhorn*, 67 Kan. 694, 74 Pac. 264; *Nordman v. Johnson*, 94 Kan. 409, 146 Pac. 1125; *Eakin v. Wycoff*, 118 Kan. 167, 234 Pac. 63.)

The court was not required to answer special questions, and the practice of submitting them is not commended. (*Oil and Gas Co. v. Strauss*, 110 Kan. 608, 203 Pac. 1111; *Lumber Co. v. Russell*, 93 Kan. 521, 144 Pac. 819; *Railroad B., L. & Savings Ass'n v. Watkins*, 119 Kan. ·409, 410, 239 Pac. 755.)

Finding no error in the case the judgment of the court below is affirmed.